May it please the Court, Counsel. Good morning. My name is Marisa Shostak, and I am the attorney representing the Plaintiff Appellant, Mr. Victor Mugnugno. Today we are respectfully requesting that this Honorable Court reverse the order granting the Circuit Court's motion for summary judgment in favor of the Defendant Appellee and remanding this case for further discovery and trial. The standard review is that of DeNovo. Today I plan on discussing why there was error and why the Court was wrong in granting that summary judgment motion in this present case. At the time of the summary judgment, the Plaintiff had provided sufficient evidence to present a genuine question of material fact existing surrounding the injuries that Mr. Mugnugno suffered on July 11, 2015. Specifically, that a negligent transfer did occur that day, that the Defendant's employee's credibility is in question, and that there are definite inferences that can be made from how this laceration occurred. Lastly, there are no personal experiences when ruling on this matter. First, I would like to discuss the issue of the negligent transfer that of Mr. Mugnugno. We believe that there is more than sufficient evidence to present that there is a genuine issue of material fact regarding this transfer. Specifically, the CNA who transferred the Plaintiff Appellant on that date, Ashley Plaintiff was unable to assist them with that transfer itself. She also testified in her deposition that the appropriate transfer for a resident who was unable to assist with that transfer would be a Hoyer Lift. So right there we have conflicting testimony as to what is an appropriate transfer and what is not. She further stated that they did perform a slide board transfer on the Plaintiff instead of the Hoyer Lift, and that it was during that time that the injury did occur. There is some question as to whether or not the Hoyer Lift was the appropriate transfer or the slide board transfer was appropriate. In this instance, we feel as though there is a genuine issue of material fact. We have evidence from this testimony that's stating that it was not a proper transfer, and yet there is conflicting testimony that it was a proper transfer. And for those reasons, we believe that the issue should be presented to a trier of fact, and it's not a matter of law that can be decided by the court for purposes of summary judgment. Specifically, there is applicable case law that states that a court should not grant summary judgment pursuant to Section 2-1005C unless it is clearly apparent there is no genuine issue of material fact, and that the judgment was correct as a matter of law. And that's Bickerman v. Losek. And with that being stated, clearly there is an issue here of conflicting evidence and conflicting testimony as to whether or not that transfer was done correctly. And we believe that only the jury of Mr. Eugenio's peers that being a trier of fact can really decide that. The second issue was that of the defendant's employee's testimony, specifically the Director of Nursing, Kathy Douglas. When taking Ms. Douglas' testimony during her discovery deposition, she stated that the transfer was done correctly. However, when pressing her on the issue of this black protective cap as to why there may have been a sharp surface on the bed frame, she testified that she personally inspected the bed frame herself. She never saw any missing caps. She never found any sharp surfaces on that bed frame. However, when we asked her further questions regarding the bed caps themselves, she wasn't able to give some very good answers. She testified that she wasn't familiar with the black protective caps, that she didn't know what they looked like, that she didn't know where they would be located, how big they were, or where she would find them. When you take that into consideration with the fact that she's saying she didn't find any missing, it can lead one to believe that maybe her credibility regarding what she found during that inspection is questionable. And that credibility is an issue for the trier of fact to decide, not for that court. Specifically, the case law states that it is for the trier of fact to determine if their beliefs are reasonable and credible. And then Poole v. Ventral Area Recycling, excuse me, stated that the trier of fact has the responsibility to determine the credibility of the witnesses and the weight given to their testimony to reserve, excuse me, resolve conflicts in the evidence and to draw reasonable inferences from that evidence. In this instance, I think this Poole v. Ventral Area Recycling is controlling, and it specifically states that the credibility of a witness and their testimony is for a trier of fact to be weighing and deciding not an issue of law for the courts to be determining in a matter of summary judgment. Also, when we look at this issue, the trial court had made some comments regarding the credibility of Ms. Douglas' testimony. And respectfully, we believe that his comments were inappropriate. The trial court stated at one point, I don't know if the jury could make any reasonable inference or, quote, inductive leap that she's lying. The trial court also stated, I can't get there, and so I'm going to grant summary judgment. We believe that, although the court may have had his best intentions in mind at this time, it is not for the trial court to be weighing the credibility or determining the weight to be given to that witness's testimony. That is an issue for the trier of fact to decide, and that is clearly stated in the Poole v. Ventral Area Recycling case. Let me ask you a question. Under the Nursing Home Care Act, the burden, I guess, is standard care for the nursing home is negative. Ordinary negligence, that's correct. And re-SIPs is certainly one. Can that not be a bind under the Nursing Home Care Act, or does that have to be led separately? Because re-SIPs is just a way of proving established negligence, right? That is correct. I'm trying to remember, if you know, does that have to be led separately? Or can that doctrine be used under the Nursing Home Care Act case to establish, to prove negligence? I think that we would need to plead re-SIPs out in a separate count, if we so wish. However, I do believe that since it would be regarding the same defendant, it would all fall under the same count. And the Nursing Home Care Act specifically states, as you're alluding, that the licensee or owner is liable to a resident for any negligence that may occur that is causing injury to that resident due to the actions or omissions of their employees. So in regard to this injury that occurred to Mr. Medugno, one could argue, re-SIPs said, this injury occurred to him during this transfer. Wouldn't that be enough? Although we feel as though the Nursing Home Care Act supports that argument, we'd like to go one step even further and say that not only is it enough that this injury occurred during the transfer performed by the defendant's employees, but that this transfer was negligent. And that there's evidence supporting the fact that this transfer was negligent. So we want to go beyond that re-SIPs claim that you're referring to, Justice Schmidt, and do one better and say that not only was it something that clearly should not have happened, but it happened by the omissions of the defendant's employees. Well, do you agree that, at least in general, it is possible for a patient to sustain an injury during a transfer without people transferring that person being negligent? I mean, bad things happen even using ordinary care, right? I mean, it could happen. Of course, accidents happen. There's no question about that. But this wasn't just a typical scratch or abrasion. This was a 17-centimeter deep tissue laceration. It required five stitches, I believe nine sutures, to Mr. Medugno's leg. He suffered cellulitis for six subsequent months following this injury, so it wasn't an artificial skin tear that you may typically see in a nursing home facility, but this was something that was a deep tissue laceration that leads one to question what was it specifically that caused this significant injury to occur. Did you ever ask the doc that sewed him up? No. We never had the opportunity to take the doctor's deposition testimony prior to this motion being presented to the circuit court, and that's one of the reasons why my client believes that he should have the opportunity to continue this discovery because we feel as though there is more evidence that can be presented to further support his claim. Thank you, Justice. There is the other issue regarding the fact that defense counsel does not dispute that this injury occurred during the transfer, which kind of goes back to what you were asking me about. In their motion for summary judgment, they even stated, quote, in all likelihood, the bed frame during the transfer caused the laceration. But in this vein, we have case law from Loyola Academy v. S&S Roof Maintenance, who gave us the case law stating, even if the facts are undisputed, if reasonable persons could draw divergent inferences from those undisputed facts, the issue should be decided by the trier of fact, and the motion for summary judgment should be denied. So in this instance, we have an undisputed fact that Mr. Maginio's laceration occurred during the transfer caused by the bed frame. However, there are conflicting theories as to how that occurred or why that occurred. That right there is enough to have the motion for summary judgment denied, and for this to go on for the trier of fact to decide and to look at all the evidence as a whole. We have testimony from Ashley Minton stating that it was a poor transfer, that the Hoyer lift would have been more appropriate, that she also testified that there was blood that she found, not before the transfer, but then she found it along the path of the transfer on the bed frame, on the bed, on his leg. So we have enough evidence there from testimony that gives us enough to say that this was a poor transfer, that this was done during the transfer, and it needs to be explored further. Defense counsel argues that there isn't any evidence stating that there was negligence, and that it's not enough for the trier of fact to determine. With those divergent theories, we believe that the trier of fact can also have divergent inferences. They can make their own conclusions as to what the circumstantial evidence is presenting, and with those reasons, it's no longer appropriate for a motion for summary judgment. It needs to go on to the trier of fact to decide that issue. Lastly, there was the issue of whether or not the trial court committed reversible error when relying upon personal experiences. And very respectfully, we believe that this error was committed. The courts have held that it is reversible error for a trial court to base its rulings on facts that are not in evidence, but solely within the court's own personal knowledge, because the judge's experiences and observations are not judicially noticeable facts, and they are not capable of immediate substantiation by easily accessible sources of indisputable accuracy. And that's Drover's National Bank of Chicago v. Grout, Great Southwest Fire Insurance. In this instance, we believe that's what happened. The trial court stated that he knew about his father's skin being thin and brittle due to his coumadin usage, and that, quote, this guy's leg looks way better than my dad's arms. Respectfully, that's something that we could not cross-examine the judge on. There was no evidence put forth so that we could look at this and investigate it and go further. And so, therefore, these are things that are not judicially noticeable facts. They're not things that my client could explore. And so, therefore, this is not evidence that can be relied upon when making a decision for summary judgment. And, therefore, we believe that it was error that he relied on those personal experiences when making his decision. Thank you. And so, with that being said, Justices, my client, Mr. Maginio, respectfully requests that this honorable court reverse the order that the circuit court had entered granting summary judgment in favor of the defendant and remanding this cause for further discovery at trial. We believe that there is more than sufficient evidence present that presents genuine issues of material fact that only the trier of fact can decide. We believe that Mr. Maginio deserves a trial by his peers, that being a trial by jury, and those peers are the ones that can decide these genuine issues of material fact, not a trial court. And so I appreciate your time and your consideration and your questions, and I thank you very much. Thank you. Mr. Kiley? Can you please report, counsel? My name is Jack Kiley, and I represent Washington Christian Village, the appellee in this matter. We believe that the circuit court's decision for summary judgment should be affirmed. I'd like to address some of the things that were just discussed by counsel. First of all, with respect to the severity of the wound, I don't think we can suggest that that is necessarily indicative of negligence. I mean, certainly you could have a minor injury that was the result of third negligence, and certainly you can have a catastrophic and even fatal injury when there's no negligence. It really depends on the facts and circumstances underlying that particular event. So I don't think that, and I know this was mentioned at the trial court as well, showing the photographs of the injury at issue, that is not an appropriate way to demonstrate the negligence in this case. Let me ask you this. Let's suppose I go in. I want to go down and ask the team of plastic surgeons to remove six or eight of my chins, and they put me under general anesthesia, and I come out. I come out. There's a seven-inch gash in the calf of my leg after I come out of the hospital. And I say, I've got a seven-inch gash in my leg. How did that happen? I don't know. There's evidence that somebody did something wrong. I shouldn't have come out of that surgery with a... Under that set of circumstances, Justice, I think that's a fair conclusion that something went awry. And I think in that instance, for sure, I think you would bring up the reception, because under your example, you would have been under general anesthesia and under their exclusive control, so to say. You also probably would have been immobile for that period of time. And I suppose what we have here is a situation where this facility is moving patients or residents hundreds of times a day. I think the record suggests it's 500 or 600 times per day. And I think in that particular instance, you can employ a slideboard transfer, as was done here, without there being a breach of the standard of care or failure to use ordinary care and still result in an injury. And I think, echoing what the trial court had to say, it's an unfortunate accident. And I think that at this point in time, when we're looking at what would a jury be asked to be deciding in this particular case, we still don't know what Mr. Maduno's leg made contact with. Well, let me, along that line, let me just say, from a common sense standpoint, other than some sharp eye, what else could have created that? And I think this is maybe what brings us here today to some extent, Justice, is that because we don't know, even the trial court, of course, using the example of his father, if you look at the photographs that are part of the record, this is a metal bed. And so we don't know if Mr. Maduno's leg came in contact with something that was as intended from the manufacturer. We don't know if there was something that came off the manufacturing line with a slight defect that wasn't discovered. We don't know if his leg made contact with the plastic cap. I know that was mentioned in the motion for summary judgment. Well, if the hospital's got a bed that's defective because of a manufacturing defect, that doesn't necessarily, I mean, they could bring, like, a third-party product to action for indemnity or something like that, right? It doesn't necessarily, maybe they've got a duty to detect that and make sure that there's... So, but I'm just thinking, can you come up with any possible, just common-sense way that this injury could have occurred absent a sharp, this leg being pressed against and dragged across a sharp object? I can only because of the resident's condition. I think because of the skin condition, he was very susceptible to skin tears. That wouldn't have to be what we would consider everyday sharp objects. And so I think that could absolutely happen. If you look at the, like I said, the photographs, there are nuts and bolts and so forth on this particular bed. And so where I end up on this is that what we have to get to is the suggestion that if a resident makes contact with the frame, that in and of itself is evidence of negligence. And the testimony we have from Ashton and Minton is that during this transfer, by intention, the resident was sitting in his bed, which means his legs were draping over the side and touching, and likely touching the bed, which would have been the same way anybody else would get in and out of bed, I would suggest, with legs hanging over the side for a brief period. So again, I think where we would argue that this is not necessarily indicative of a breach of the standard of care or a lack of showing ordinary care is that every transfer where a resident's leg touches the bed can't be evidence of negligence. And I think that's a reasonable position, but the point of it is, is there enough here? And that's a good argument. The question is, is there enough evidence here to raise a reasonable inference where if a jury decided, gee, if a jury were to decide, yeah, you were negligent because the sharp object cut that, would that be an unreasonable inference on their part? So I don't think the issue is, has the plaintiff established, proven negligence by virtue of this cut, but have they raised a question of material value, and the fact that that's whether there was negligence. In response to that, Justice, I would say, based on the evidence we have in the record, this should be considered, I would say no, because the evidence is unrefuted that there were any sharp objects on this bed. The evidence is unrefuted that the bed was inspected afterwards and they couldn't figure out what his leg contacted. And so counsel has indicated today that they need to conduct more discovery, but that wasn't part of the summary judgment proceedings where they said, hey, we're filing a 191B affidavit, we need to figure out what happened here. None of that happened, so what we're looking at is this record. And sure, I suppose if they took a half a dozen more depositions, they might find something else, but that's not what the record shows at this point in time. So what the record shows at this point in time is a bed that was inspected following this particular injury with no findings of what happened. And to your point earlier, because there was no findings, using my hypothetical example, that there was something that came off the manufacturing line showing some defect or whatnot, there's an opportunity for indemnity on our behalf because our evidence is there was nothing wrong with the bed. We still can't figure out how this even happened. And so we are kind of between a rock and a hard place in the sense that they've not yet shown or proven or alleged anything. They're kind of all in on this black caps idea, but the uncontroverted testimony there is that this bed had all the caps on it. And they're circumstantially raising the issue that six months down the road, the Department of Public Health determined that 23 beds did not have these black caps, but this bed was not one of those. So all of the evidence would suggest that this bed had these caps, and that is really the predominant allegation here is regardless of how the transfer happened, the lake still made contact where this cap should have been, and all the evidence we have is the cap was where it should have been. And as far as the credibility issue that was raised is concerned, I mean, that would be, on any case when summary judges are granted, what an easy way to reverse if you just said, well, we didn't think the witnesses were being honest. And that's our basis is to call into question their credibility. I don't think it's an unusual situation to have a case where the adversary thinks their adversary is not being given truthful testimony or accurate testimony. That's why we're here. That's why we have these cases at the trial court level as well. But the fact of the matter remains, the evidence we have to consider in the record indicates that an inspection was done after this incident happened and revealed no defects, no exposed metal, no raw metal, no sharp edges. And so, again, we're left with that's what the record shows at this point in time. And, again, that leads us to the situation where it is a race, it's an argument they'd have to raise, where by virtue of the fact that this man's body made contact with the bed that he was being put into, so he's going to be making contact with his bed, is evidence of negligence. And we just think, I mean, for one, I mean, what a burden on these facilities if they somehow have to place these residents onto a mattress without their body ever making contact with the frame. I just, there's a lot going on in that respect for me in terms of what would be unreasonably burdensome for them to expect. And I don't think anyone is even alleging that it was improper for his leg to touch the bed if his legs were draped over the side. So then the question is, what is this leg contacting? We don't know and we're disappointed. I get the impression that the plane was, I mean, somewhat, while able to sit a little bit, but it was also somewhat zoned out. In other words, not fully aware, fully alert, as though he could say, yeah, this happened or that happened. He was certainly, Ashley Menton, who was our certified nurse assistant, who's one of the two depositions that were in the record, she did testify that he was lethargic. And that was part of the discussion as to what method of transfer was used. The slideboard transfer was one that they were trained upon. And again, I don't think there's any evidence that the method was done incorrectly. I think they followed all the steps in that method. But she did say that because he was lethargic, that was what she described as a poor transfer was her choice of words. And basically just saying he wasn't able to assist us. But also his ability to report, his ability to report about what happened during the transfer. That's a fair point, sure. At the time of the transfer? I don't, Justice. Oh, you mean for the duration of his stay? I don't know that off the top. I do think he had been a resident there for some period of time. My understanding is he was severely debilitated due to a stroke. And so I think he had been what they referred to as an extensive assist for the duration of that period of time that he was there. And do you know if there's been any evidence of earlier injuries? That I can say affirmatively there was not. Not only not with this particular resident, but there was testimony that no other resident had ever encountered a similar injury as well. This was the first. And I think that was at the trial court level that was something that we weren't the attorneys at that point in time. But what they argued was kind of a notice issue is that we had no reason to think this could happen or know this would happen because it hadn't happened before. Again, harking back to my statements made earlier that they were doing 600 transfers per day. I mean, so in a week you're in the several thousands. And this is something that had never happened according to our director of nursing. And of course we're talking here about negligence. We're not talking about whether, nobody's alleging that your client or their employees were the brutal nursing home people that were slapping patients around or kicking them or being mean to them. Sometimes, like I said, injuries occur without negligence, but sometimes good people are negligent. Absolutely. And that's, I mean, it's of course a reasonable standard we're all familiar with. And here we would say that the evidence would show, the evidence we have to consider in the record would show that the transfer that was done was done correctly. We don't know what his leg made contact with. Ashley Menton testified that she was sure that the leg made contact with the bed. But again, I don't think we can, from our perspective, we don't think that can be an indication of negligence. Just the fact that his leg touched the bed. And again, if you review the photographs, again, this is a metal bed. So there are going to be things that a leg can touch. And again, we simply don't know. If we're arguing this to a jury... Would it be unreasonable to draw the inference that this leg most likely did more than just touch metal? Oh, certainly. I think absolutely. It would suggest to me that when he was raised, I mean, certainly whatever his leg was making contact with, his leg stayed in contact with, because we have a tear, and it's a significant tear. There's no question about it. But again, we don't know what that was. And so that becomes, at this point in time, it's kind of put up or shut up time, so to speak, as far as what the evidence will be. And right now, what we have is evidence that this bed had every black cap that it was supposed to have, and the plaintiff is alleging that a missing black cap is what caused this injury to occur. So again, based on the pleadings, which we're dealing with, the absence of a black cap is what they're alleging happened here. And again, the direct evidence we have is that this bed had every black cap that it was supposed to have, and that was determined by our director of nursing shortly after the accident. Could you address the contention that the trial court relied on its own experience? I would be happy to, Justice. So reading the record as it relates to the oral argument, and we mentioned this in our brief, there were a lot of volleys going back and forth between counsel for both parties, and frankly, counsel for both parties were kind of injecting their own personal experience and their own personal opinions into this. And so my impression was the judge was kind of just chiming in with his own personal experience, because the appellant's attorney at oral argument had said, you know, these injuries don't happen to have some negligence in his experience or his opinion, and so forth. And so my impression is the judge simply echoed his experience to say, well, you know, I think you can have an injury like this without there being some negligence. I also don't interpret the trial court's opinion as having, or his own experience as having been the deciding factor. And I do think, because this is a de novo review, there's ample evidence on the record to support affirming the summary judgment, even given the judge having this banter or discussion with the other attorneys that were present for that. I have one other question. I remember in law school being taught about the eggshell point. Do we have a situation where we have someone, you've said, and apparently the judge said that the skin was brown, and is there a factor of that here? Well, I think what we have here is if there was evidence of negligence, it would not be a defense of ours to say there's no recovery because he was the eggshell plaintiff, to use your example. But I think what we would say here is certainly there was no breach of our duty here because there's no evidence of negligence in the first place, so we don't arrive at the damages issue. That would be how I would look at that. I'm just looking at it not from the damages. I was talking about the damage to his leg. But do you have a heightened duty if you know that you have a person who has an increased potential to be injured? Not specifically under the Nursing Home Care Act. It would still be ordinary care. But residents do have a right to be, several resident rights, and certainly one of those is to be held to the highest level of personal freedom is one of those. But I think there wouldn't be a heightened sense. It wouldn't be like the innkeeper or something like that, or the common carrier standard. It would still be ordinary negligence. But I do think you take your plaintiff as you find him, and that's why we have assessments, that's why we have care plans, that's why each of these residents has an individualized experience and plan of care while in that facility. And to that point, that's why someone like Mr. Meduno would be needing transfers, would be assistance of two people, whereas others who haven't suffered strokes and so forth might be independent with their ambulation and everything else. So to the extent there was a heightened standard that would be based on his personal needs, and those would be addressed through his care plans and assessments. However, implementations of those assessments and care plans would still be just applying the ordinary standards. In other words, just maintaining the standard of care. Thank you. All right. Thank you, Mr. McKinley. Ms. Shostek to rebuttal. Very briefly, Justices, I would like to address one of the issues, and I believe it's the main issue that opposing counsel referenced during his argument, and that was whether or not there was a missing black cap, and that was what caused the injury. On the contrary, what we're arguing is that there is a genuine issue of material fact surrounding is the issue of the negligent transfer. We believe that this was done incorrectly. Defense counsel mentioned the slide board transfer allows for the residents to hang off the side of the bed and touch the metal bed frame. Ms. Minton testified during her discovery deposition that a Hoyer lift is the appropriate transfer for a resident who is unable to assist with a transfer. A Hoyer lift is an entirely different type of transfer where you essentially put them in almost like a hammock, lift them up, put them over the bed, and then lay them down on the bed, thereby preventing any contact of the legs hanging and being drug across the bed frame. And that is why we feel as though this transfer was negligent. Had this Hoyer lift transfer been done, which was the appropriate method of transfer for a patient such as Mr. Medunio, his leg would have never come into contact with this bed frame. And this bed frame, which for whatever reason had a sharp surface on it, would have never lacerated Mr. Medunio's leg. That is the real issue that we're focusing on, is not bed caps and whatnot, but this negligent transfer. And all of the testimony regarding Kathy Douglas or IDPH reports or other evidence regarding the bed frame itself is really to show that there is conflicting evidence and there is a credibility issue that needs to be addressed by the trier of fact when taking this negligence issue in its entirety under consideration. And for those reasons, we have those side issues that need to be addressed by a trier of fact, because at the end of the day, what they do is they come back to this issue of negligence and whether negligence occurred at the time of transfer. And for those reasons, that's why we believe the motion for summary judgment should have been denied and why we ask that this Honorable Court reverse that ruling here today. Thank you. Pursuant to the record, we are not aware that it ever was used before. That was never an issue that was brought up and that's not on the record, so I cannot say one way or another.